May it please the court, counsel. There are two principal issues in this case. I'm going to deal with the primary issue, which is the emergency aid doctrine and whether it applies in this case, and whether there was reason to believe that there was an emergency at hand and whether the officers acted appropriately. This resulted from a call in the early morning hours of January 1, 2005. This call came in to dispatch in Fort Hall and indicated that the officers needed to respond to the Dennis Snipe residence, that someone needed assistance. The call was immediately terminated, no verification of caller ID, no verification of who the individual was making the call, no basis of what kind of emergency was given. The officers then responded in two separate vehicles. They drove separately shortly before the residence, indicated that they turned off their lights and sirens. As they approached the house, they saw an open door. There was no indication of any kind of problem. There was a porch light on and a couple... The door apparently was slightly open. There was a little light coming through it? No. The officer testified that as they approached the door, they pushed on it and the door opened, that it was not locked. There was... No gap in it or anything at that point? No. That indicates not just that it wasn't locked, but that it wasn't latched, doesn't it? It does. There was testimony in the suppression hearing, although the officers testified to the contrary, that the door was open when they pushed it, but that there was a screen door and an actual door and that both had to be open and that both latched.  Officer Rodriguez was familiar with at least Mr. Snipe. He knew who he was and where the residence was. There was a car in the driveway that Rodriguez said that he didn't recognize being a car from the neighborhood. Correct. And there was a person who ran into the house as the police came up? Didn't run. They walked. Walked away. They walked in and I guess one of the points I would make is that the officers certainly could have contacted that individual. Maybe they weren't in close enough proximity or didn't want to approach the person because obviously the officers may not have known what kind of circumstance they were dealing with. If those three items that we just talked about, the open door, I may be wrong about that, but if you set those aside, then, we still have the time, it's about 5 in the morning, wasn't it? It was about 5 in the morning. It was dark. They were dark, New Year's morning. And then what we really got is what was said on the phone, how it was said and how that was conveyed to the officer to determine whether it was an emergency. Yeah. Yes. Is that about right?        It was dark. It was dark. It was dark. It was dark. It was dark. It was dark. It was dark. And the dispatch relayed that information to the officer. So what the officers got was second hand, but essentially that some kind of assistance was needed at the residence. It was an hysterical mail. He said something about, get here now or get here right away. That's what the dispatch lady that took the call testified to. We have a recording of the 911 call? We don't. We asked and they indicated that for whatever reason the recording device wasn't working at that time.        Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay.  Okay. Okay. Where did the officers make their mistake? What, I mean, should they not have gone to the house? Well. The 911 call not sufficient to respond? I certainly think that there is a general obligation and certainly a great responsibility to us in general for officers to assist persons with serious injuries or potential threats, those kinds of things. It's just that we also have countervailing on the other side, the right of individuals to be safe in their homes and from. Where should the officers have stopped? Well, I think they. Knocked on the door? They could have knocked on the door. They could have announced. Did they knock on the door? The officers testified they did. There were. They knocked on the door and the door opened because it wasn't locked. Correct. Yeah. There was testimony of at least one person from inside the residence that they never heard any knock, that they never heard any announcement. So, at least they should have knocked and announced. Did the officers testify that they knocked? The officer. Officer Rodriguez testified that he knocked. Yeah. So, he asked somebody inside the house. He says, I didn't hear him knock. And the officer said, well, I did. Right. So. So, it looks like the officers did what they were supposed to do. Now, when the door opened, what were they supposed to do? I think announce at that point. I think make an announcement that they were there for assistance. The individuals seated in the room were around the corner. And so, some kind of announcement saying, hey, is anybody home? What, the officers walked in? They walked in. And they should not have walked in? Well, it's my belief that they should have knocked and announced. And when they announced, they announced, what did they say? Were policemen, may we come in? Or did they just say, police and walk in? What should they have done? Well, they should have announced who they were and why they were there. And if anybody is in need, make an inquiry. They could have also contacted the individual walking into the house to see if that person knew of any particular circumstance. But there was nothing to indicate to the officers that there was any particular problem. Certainly they have the right to verify and determine whether there's an emergency situation. But it has to be reasonable under the circumstances. I don't get exactly what they can do except go in and look around. Once they've got that hysterical male voice saying, police, come now, I'm thinking, suppose I'm a policeman with the jaundiced eye that policemen often have. And I talk to the person who's entering the house, and I say, you know of any problems here? He says, no, no problem. And I knock on the door, somebody comes to the door, and I say, any problem here? He says, no, no problem. Seems to me that after that call, being a policeman with a jaundiced eye, I'm wondering if somebody is all wrapped up in duct tape and gagged in another room. So I want to look around a little. What's the matter with that? Well, it has to be done within reason, and I guess- It's pretty clear, it's 5 o'clock in the morning, it's pretty clear there's a lot going on at this house. The number of cars, cars we don't recognize, people walking in. It's not a situation where we think that if there's something going on that it's a burglary because the place is closed up tight and all the lights are off. It's clear that there's some activity going on inside. Yeah, well, clearly there was. There were a couple of vehicles, lights on. This is 5 o'clock in the morning, of course it's New Year's Eve as well. Wouldn't that arouse the possibility that there was drinking going on, and that maybe there was either a fight, that's our Brigham City case, or that maybe there's some kind of domestic abuse, as Judge Kleinfeld might have suggested? Yes. However, certainly the facts of the Brigham City case were quite a bit different. The officers personally observed some issues going on here. Going up to the house, the officers really had nothing other than just the call. The calls in. The call? The call. The anonymous call without any verification. Well, if it was a snitch, and they were investigating some past crime, then I could agree with your argument in the blue brief that they don't have any reason to believe the snitch. There's no corroborative evidence at any time. But it's not a snitch call, it's an emergency call, and it strikes me as a different category. I agree, and I think there is some difference in the nature of the call and the duty that officers have to respond. It's just, you know, one of the things that I look at is, does that mean that regardless of the call, when officers receive a call like this, is everything fully warranted? I mean, they can just go into anybody's house at any time if there's an emergency call. And I'm not sure that that's where the law should be. Oh, before your time's up, could you help me with one other thing? Sure. As I understand it, this was not a written plea agreement, it was orally entered on the I believe that's correct, yes. Rule 11-A-2 says that with the consent of the court and government, a defendant may enter a conditional plea of guilty, reserving in writing the right to have an appellate court review an adverse determination. Here, your reservation isn't in writing, it's orally. Now, frankly, in my practice, that's how we usually did it in state court. We hardly ever did them in writing. It was always an oral reservation reported by the court's reporting equipment. Do you happen to have any cases that say the oral recording is good enough, even though Rule 11-A-2 says in reserving in writing?  Thank you. Thank you. May it please the court and counsel, I'd like to first go through the facts as they were developed on the record of the suppression hearing. Dispatch at Fort Hall received a phone call that in the suppression hearing the dispatcher related was an hysterical male calling and screaming, get cops now, to the Dennis Knife residence. She immediately relayed that information to the officers on the beat, Officers Rodriguez and Massey, on a secure channel to avoid anybody who might be listening. Counsel, I'll tell you what sort of bothers me about the way the officer responded, and that is that if they thought it was important enough to go into the house, why didn't they go into that back room? Why aren't they looking for the person in Judge Kleinfeld's duct tape that was found in the back room? I think that the officers, until the time they walked into the house and saw what was going on, were very concerned that someone was hurt or injured, that there was an emergency there. Once they walked into the house, and almost from the moment they walked into the house they developed probable cause to then going. For drugs. Right, for drugs. But the emergency call would not have been an emergency call. Somebody said, quick, somebody get over to the Sonny Snipe house, they're using drugs. Right, but once they got into the house and saw the group of people there, some of whom they were familiar with, one was a neighbor of one of the officers, and saw that there didn't appear to be any alarm there, I think their fears were somewhat allayed, although of course what they did do was go around to the house and look through all the rooms. They saw a woman and a child, I should say a teenager and a child sleeping in one of the rooms, which I think probably allayed the officers' fears that any kind of emergency had recently been occurring within the last five minutes because there was a child and a woman asleep. When that door was locked, certainly I think they could have gone in there to check, but I think because Mr. Snipe, who was a neighbor of Officer Rodriguez, said go ahead and go on in, I think the officers' fears were allayed, which of course is what the district court found. And I think under the circumstances where you have a small community like you do at Fort Hall, and Officer Rodriguez being familiar with the neighbor, with the residents, with at least one, two of the individuals. How many people were around the table? I think there were four or five within the house. And how many did Officer Rodriguez know? Two. I'm not sure that's completely developed in the record, but Officer Rodriguez knew Sonny Snipe, and I believe also Frederick Nelson was reflected in the record as someone he knew. So he was familiar with these individuals. Once they got into the house, the door, the testimony is very clear from Rodriguez and Massey that they knocked on the door. And as they knocked, the door came open. When the door came open, Officer Rodriguez saw an individual right in front of the door that he didn't recognize. That's when he went in or looked around the corner. It's somewhat unclear exactly what he did, but he could see some people at the table, but not all of them. And he didn't recognize the ones that he saw when he looked in the house from the time he knocked on the door. And he could hear voices as well. That's when he went inside the house and then immediately saw the drug deal going on around the table, along with two individuals that he recognized, as well as the others that he did not recognize. One thing that sort of surprised me here, and maybe you can offer an explanation, was there any attempt to hide these drugs? I mean, the guy sort of said, well, take a look around the house. You know, we're just doing drugs over here on the table. There was. I think, and I can't point to it, but I believe in the record it showed that one of the officers testified that they were trying to hurriedly hide the drugs as they walked into the house, as they saw the officers enter the house. So there was an attempt to get rid of the drugs that were right out there in the open. It was a small, a small house, and you could, Officer Rodriguez testified that he could see an individual on the chair, on the couch as he walked in, but that he could also see some individuals in the dining room, but had to go in to see the rest of them. The circumstances here, I think, are of a type that as a community, if the officers had not that the community would not have been pleased if the officers had responded in any other way. You have a hysterical male saying, we need help now. It's 5 o'clock in the morning on January 1st, a cold, dark day. They get there. They, one Officer Rodriguez sees someone who doesn't, a car he doesn't recognize, an individual he does not recognize, walking into the house, and Officer Massey testifies that he can see lights, and that as they walk to the house and knock on that door, their fears are then confirmed. There's someone in the house that they don't recognize, and they go in to see what's going on. And I don't think that we can expect the police to do anything differently than what they did. The call was untraceable. The dispatcher testified, and the officers responded very quickly to the request for their, really the cry for their assistance, not just a request. And as soon as they walk into the house, they then develop the probable cause that results in the search warrant and the finding of the actual weapon that's at issue in this case. Was there ever any testimony from the officers at the suppression hearing about why they didn't go into the room that had the locked door? I think, Officer, I don't believe there's any testimony about what their thinking was, just that once Mr. Snipe offered to let them go into that room, and based on their other observations, the sleeping girl and child, that they felt like their fears that someone in the house was hurt or injured or had immediately, I mean, I think the response time was five minutes, right around five minutes, but there wasn't anybody who could tell me. Could you cite us to the page or whatever where they say, well, once we saw the sleeping child, we figured everything was okay. That's my conclusion, Your Honor, and I believe that the District Court, in its findings, stated that Snipe's offer to allow Massey to kick down the door likely allayed Officer Massey's concerns, since it is highly unlikely that Snipe would allow an officer to kick down the door if he were trying to hide the contents of the room. And, of course, the District Court did express some concern about that close room. Did you say that or just the judge? What's that? Just the judge, I believe. But I think we need to look at the circumstances as well. Officer Rodriguez testified, and so did, or I know Mr. Snipe testified, and I believe Officer Rodriguez confirmed that they knew that it was the Dennis Snipe residence. That's Mr. Snipe's father. It was the Dennis Snipe residence. Sonny Snipes, the defendant in this case, testified that he lived there off and on over the last, I think, five years, but that he'd been raised in that home and lived there off and on currently, but that it was his father's residence. And Mr. Officer Rodriguez knew that fact about this residence. And Sonny Snipes' explanation about that closed and locked door was that those were his father's things, and that's why the door was locked, because his father kept things in there. Well, now, the officers used the information they got from their entry, if you will, to get a search warrant to search the house, did they not? That's correct, Your Honor. And when they searched the house, did they go into the locked room? I don't know that, Your Honor. It's not in the record, and I don't know. When the door was locked, somebody else said, well, it's my dad's place, and it's locked, but if you want to get in, go ahead and kick the door down. Right. And the police decided no, they didn't want to kick the door down. Right. And I believe as well that Mr. Snipes offered to the officer to get the key or to kick the door down. Okay. On this appellate issue of reserving the right to appeal and that reservation having to be in writing, have you come up against that before in any other case? I haven't, Your Honor. And that was my mistake not to get the reservation of the right to appeal in writing. I went back and reviewed the record at the change of plea hearing, and the defendant did state they were going to appeal this issue, and we agreed that we knew that the defendant was going to appeal that issue. So we did not bring it up in our brief since we essentially agreed to it. I'm saying that on the record, which was transcribed because we got the transcript of it. So it's in writing now. And I suppose a rule would be to make sure that the defendant did reserve the right to appeal and that that was agreeable as part of an agreement with the government. And if there is a writing that does, in fact, show that to be the case, I wonder if that's sufficient. I don't know. Have you ever thought about that or not? Your Honor, I haven't thought about it. Once I looked at the record and realized that I had at least acquiesced in the request to appeal, if not wholeheartedly endorsed it, I didn't pursue that issue any longer. There's no question that it's plain on the record that in open court on the record, the reservation was made and not objected to and agreed to by the judge and the prosecutor? I can't say that it went so far as agreed to by the prosecutor, but I certainly did not object to it. And I understood that it was the defendant's intention. I can't say that I went any further than that. There's no words that would cause the judge to think that you did not agree to it? No, I did not. The judge certainly would have got the impression that we had no objection to the appeal. That's all we have. Thank you. Thank you, counsel. I just wanted to indicate to the Court that the location in the transcript on page 90 refers to that locked room. The Court questioned about going into the locked room, and Sonny Snipe offered to kick the door in if the officers wanted to do that. They didn't do that. My recollection is that that room later was searched when the search warrant was obtained. Thank you, counsel. United States v. Snipe is submitted.
judges: Thompson, Kleinfeld, Bybee